[Civ. No. 20667.   First Dist., Div. One.   Aug. 13, 1963.]

PEARL H. DORAN, Plaintiff and Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant and Respondent.

Hollander, Lipian & Horwitz and C. Jay Hollander for Plaintiff and Appellant.

Bledsoe, Smith, Cathcart, Johnson & Phelps and Robert A. Seligson for Defendant and Respondent.

MOLINARI, J.—This is an appeal by plaintiff, Pearl H. Doran, from a judgment in favor of defendant, State Farm Mutual Automobile Insurance Company, after a trial before a jury, in an action to recover upon an automobile insurance policy.

### The Record

This appeal comes before us upon an agreed statement of facts, the essentials of which are as follows: On June 1, 1957,[1] defendant insurance company (sometimes hereinafter referred to as "the company"), issued an automobile insurance policy to Joseph E. McKeever, Jr. (hereinafter referred to as McKeever), and Donna L. McKeever, his wife,[2] covering a

---

[1] All date references hereinafter, unless otherwise noted, are to the year 1957.

[2] Said husband and wife will sometimes herein be designated as "the McKeevers."

1949 model Plymouth automobile. The application for said policy, signed by Mrs. McKeever, gave the address of the McKeevers as 2187 Bonifacio Street, Concord, California.[3] This policy was numbered 3338-546-F01-05 and covered said 1949 Plymouth for a period of six months from date unless the policy was sooner cancelled or otherwise terminated or transferred. The policy address of the McKeevers, as shown in the declarations of said policy, was designated as 2187 Bonifacio Street.

The policy issued by the company consists of declarations and the company's policy form 9415.[4] These constitute the entire contract between the company and the insured. The declarations are contained on pages 1, 2 and 3. Page 4 consists of an index. The balance of the policy, pages 5 to 17, inclusive, contains the insuring agreements, policy conditions and mutual conditions. The format of the policy is such that it consists of an envelope in which the policy form is inserted. Pages 1 and 2 of the policy, consisting of declarations, are printed upon and contained within the envelope portion. Pages 4 to 17, inclusive, are contained within and comprise the policy form. The policy number, name and address of the insured, policy period, premium, description of the automobile and a designation of the coverage as defined in the policy form are contained on page 2 of the declarations (i.e., in the envelope part of the policy). The information contained on page 2 of the policy is duplicated on what is called an "X card" which is the company's principal record of the policy information contained in its files. The company does not keep a copy of the declarations on page 1 (printed on the envelope) or of the policy form (pages 3 to 17, inclusive), because these provisions of the policy are uniform. The policy form (which is inserted in the envelope), contains the standard policy provisions. The insurance information which is peculiar to a particular policy, such as policy period, number of the policy, name and address of the policyholder, premium, description of the automobile, and coverage designations, is stamped by a duplicating machine on page 2 of the envelope and on the "X card," and, therefore, is always the same on both of these documents.

On August 15, McKeever made a claim on said policy for the theft of hub caps from said Plymouth automobile. The

---

[3]All address references hereinafter, unless otherwise noted, will be to Concord, California.

[4]Hereinafter referred to as the "policy form."

claim report signed by McKeever bears, in handwriting, the address 2187 Bonifacio Street, and below said address, also handwritten, the notation "just moved to 137 Pine St., Concord, Calif." All of the handwritten data on said report was in the handwriting of a Mrs. Ann Hopper, a secretary in the office of Wyman Graham, the company's agent at Concord, California. Mrs. Hopper testified that she received the information on the claim report from McKeever, who told her at the time she took this information that he had moved to 137 Pine Street. McKeever admitted the signature on the report was his, but denied that he had given any information to Mrs. Hopper, and denied that he told Mrs. Hopper that he had moved to 137 Pine Street. It was McKeever's testimony that he gave the information for the report to Graham, who wrote it all down. This was denied by Graham, who testified that none of the handwriting on said report was his.

Prior to making said report, and on the same day, McKeever had purchased new hub caps, to replace those which had been stolen, from the Premium Auto Supply. He obtained a sales receipt from that company for the purpose of verifying his claim under his said insurance policy. McKeever testified that he told the salesman at the auto supply company what his address was and the salesman wrote it down. This sales slip was delivered to Graham's office at the time the claim report aforesaid was made out. This receipt, which bore the address 137 Pine Street, was retained by defendant company. At the time McKeever made said claim report, he actually resided at 135 Pine Street, having moved to said address from the Bonifacio Street address around the 1st of August. The claim for the hub caps was paid by the company's check, dated August 22, which was mailed by Graham's office to 137 Pine Street on August 22. Graham testified that said check was never returned to him.

The company provided no particular form by which a policyholder would indicate a change of address, but permitted this to be done by a verbal communication from the policyholder to the company's agent, with the agent changing the address on his records and notifying the company. The "X card" aforesaid, was introduced in evidence. It shows a pencil line drawn through the printed words and figures "2187 Bonifacio St. Concord Cal" and under it the words and figures "137 Pine St." in pencil.

On August 20, McKeever purchased a 1955 Plymouth automobile from Fitzpatrick Chevrolet Company in Concord. He

turned in the 1949 Plymouth in trade as a partial payment for the new car. McKeever testified that immediately after he purchased the car (on August 20) he took the registration papers personally to Graham's office; that he told Graham he just purchased a new car and wanted a policy to cover it; that Graham asked him for the relevant insurance information (make, model, etc.); that he gave Graham the registration papers for the latter to use in this regard; that the registration papers showed McKeever's address correctly at 135 Pine Street; that an application for an insurance policy was filled out this time by a person whom he believed to be Mrs. Graham; that the application was filled out in his presence from the information contained on the registration papers; that he never signed, nor was he asked to sign such application; that he never told anyone his address was 137 Pine Street; that he did not know whether he subsequently received the policy through the mail at his home at 135 Pine Street; and that he was not able to locate said policy for the trial. Mrs. McKeever testified that on August 20 she accompanied her husband to Graham's agency and waited outside while he went in to get insurance on the car. She stated he had the registration papers for the car they had just purchased, and that these bore the address of 135 Pine Street. She testified, further, that she did not remember whether she received a policy on the 1955 Plymouth, and also stated that she had been unable to find such policy at the time of the trial.

The aforementioned application for insurance, which was unsigned, designated 137 Pine Street as the residence address of the McKeevers. Said address was handwritten. Among the other portions which were handwritten were the numbers 3338-546-F01-05 opposite the printed words "Old Policy Number." Graham testified that the handwritten portions of said application were mostly in the handwriting of his wife; that he had no personal knowledge of how or when it was made out; that McKeever never came to his office to fill out the application; that the usual practice, when someone who was already insured purchased another automobile, was to fill out an application upon information received over the telephone from an automobile dealer, because the dealer is desirous of establishing the existence of insurance before he permits the buyer to take possession of the automobile; and that he believed that this procedure was followed with reference to the application in question. Graham testified, further, that he mailed the said application to the company's head

office in Berkeley, and that he subsequently received from such head office policy No. 3355-955-F01-05, covering said 1955 Plymouth, which he mailed to the McKeevers at their address as listed on his records and on the policy, to wit, 137 Pine Street. He also testified that the said policy was never returned to him.

A copy of the policy form of said policy (pages 3 to 17, inclusive) was introduced in evidence by plaintiff, but not the envelope (pages 1 and 2) in which the same was contained, the McKeevers both testifying that they were unable to find such envelope. The "X card" for said policy on the 1955 Plymouth, bearing policy No. 3355-955-F01-05, was introduced in evidence by the company. Imprinted on said card are the names of the McKeevers, as the named insured, and the address: "137 Pine St. Concord Cal." Under the notation, "Former Policy," on said card is the number 3338-546-F01-05. The "X card" for policy No. 3338-546-F01-05 (designating coverage on the 1949 Plymouth) also bears across its face the stamped word "Transferred," and under it, in pencil, the following notation, to wit: "3355 95505 8-21-57."

On September 7, McKeever was involved in a collision with another automobile while driving the 1955 Plymouth car. He made a report of the accident on the same day to Graham. With the exception of the handwriting under the designation " 'Describe the accident,' " which was in McKeever's handwriting, all of the writing on said report was filled in by Graham. McKeever's address appears on said report in Graham's handwriting as 137 Pine Street. Graham testified that he made out the claim report in McKeever's presence and that he received all of the relevant information, including the address, but excepting the coverage information (i.e., the policy number, the motor number of the car, etc.) from McKeever. The latter, on the other hand, testified that he gave the said information to Mrs. Hopper, and that all of the writing on said report, which was not his, was that of Mrs. Hopper. McKeever testified further that he never gave Mrs. Hopper the address of 137 Pine Street. Mrs. Hopper, in turn, testified that the handwriting on said claim form, apart from that of McKeever, was Graham's.

The last mentioned claim report contains, in handwriting and opposite the printed words "Policy No.," the following: "Tr. 8/21/57 from 3338-546-F01-05"; and below it, the following: "3355 955 F0105." Graham testified that this legend meant that the coverage issued under the policy on the 1949

Plymouth had been " 'transferred' " to the new policy number on the 1955 Plymouth. Maury E. Barnes, Jr., claims superintendent for the company, testified that the word " 'transferred' " as used by the company in this situation meant that the policy holder was continuously insured by the company when he changed cars, but that there were two separate and distinct policies of insurance issued—one for the 1949 Plymouth and one for the 1955 Plymouth—and that the new policy supplanted the old one entirely and was an independent and separate contract.

On October 10, the company mailed a letter to the McKeevers at 137 Pine Street, advising them that the company elected to cancel the policy on the said 1955 Plymouth as of 12:01 a.m. on October 22, and that a check for the unearned premium was being sent to Graham for disposition. The said letter also suggested that for their protection the McKeevers should obtain insurance elsewhere before the cancellation date. A copy of this letter was mailed to Graham on the same day, as was a check for the unearned premium. The said check was mailed to the McKeevers at the 137 Pine Street address by Mrs. Hopper on October 14.

The envelope containing the said letter of cancellation was returned by the post office to the company on October 16. The envelope was marked " 'Unknown at this address.' " The aforesaid check for the unearned premium was, however received by the McKeevers. McKeever testified that he did not know what the check was for, so he went to Graham's office to make inquiry. He stated that Graham was not there so he asked Mrs. Hopper what the check was for; that she checked her records and told him she couldn't tell what it was for; and that she told him to cash it anyway. Mrs. Hopper testified, regarding this incident, that McKeever came into the Graham Agency on October 17; that he asked her what the check was for; that she checked her records and saw therein a copy of the company's letter of cancellation to the McKeevers; that she showed this letter to McKeever and told him that his policy had been cancelled; and that she told him that the check was for his return premium. Mrs. Hopper testified also that McKeever then told her that he had never received the letter of cancellation; that she stated that this was peculiar and asked him where he was then living; that McKeever said he thought his address was 135 Pine Street; that she showed him her copy of the letter of cancellation and told him that he had better get other insurance in view of the fact that his insurance would expire as indicated in the

letter on October 22; and that McKeever read such letter in her presence. Mrs. Hopper also stated that at that time she made a notation of her conversation in regard to his address on her copy of the letter of cancellation. Said letter was admitted in evidence and bears the following notation: "10/17/57 he was in and said he hadn't got this letter— *thinks* his address is 135 ? ? Pine."

On October 22, the company sent the envelope which had been returned to it by the post office to Graham with a note asking what McKeever's address was. On October 25, Graham replied to this inquiry to the effect that he had checked with the post office and that McKeever's address was 135 Pine Street. This reply was received by the company on October 28. The check for the unpaid premium payable to the order of the McKeevers had in the meantime been negotiated and cashed by them, the said check clearing the bank on which it was originally drawn on October 29.

On October 30, the company mailed the original letter of cancellation to the McKeevers at 135 Pine Street with an accompanying letter explaining that the letter of cancellation had originally been mailed to the address given on their application; that it was the company's understanding that Graham had already contacted them regarding this matter; and that the check for the unearned premium had been delivered. These letters were received by the McKeevers shortly after the accident which is the subject of the instant action. This accident occurred on October 31, when the 1955 Plymouth operated by McKeever struck plaintiff, causing her to suffer injuries for which she brought an action against McKeever. The company, upon a tender made by the McKeevers, declined to defend said action on the ground that the policy of insurance covering the said 1955 Plymouth had been cancelled on October 22, and refused to negotiate settlement with plaintiff herein on the same grounds. A judgment by default was obtained by plaintiff in this case in her action against McKeever for the sum of $17,428.79. Thereafter, the McKeevers assigned all of their right, title and interest in and to any and all causes of action they may have against the company "'under their policy of insurance number 3338-546-F01-05,'" whereupon plaintiff brought this action against the company for said sum of $17,428.79. The basis of said action was that the company was liable to plaintiff as a third party beneficiary of said policy, for whose express benefit the policy was issued to McKeever, and upon the ground that

the company wrongfully and in bad faith refused to settle plaintiff's claim and the judgment aforesaid for the policy limit of $10,000 demanded by plaintiff, thus breaching its duty to McKeever, its insured.[5]

In relevant part that portion of each of the subject policies having to do with cancellation by the company read as follows: "The company may cancel this policy by written notice, addressed to the insured named in the declarations and mailed to the address shown therein, stating when not less than ten days thereafter cancellation shall be effective. . . . The mailing of the notice shall be sufficient proof of notice and the effective date and hour of cancellation stated therein shall become the end of the policy period. Delivery of written notice shall be equivalent to mailing."

### The Question Presented

The main question presented in this case is whether there was in force on October 31 an insurance policy issued by the company to McKeever which indemnified him for damages for personal injuries to plaintiff herein arising from the operation of the aforementioned 1955 Plymouth automobile. Defendant company maintains that there was no such insurance policy issued by it in force, the contention being that the policy issued by it and affording such coverage was cancelled by it as of October 22 by virtue of the provisions of said policy and as provided by law. Plaintiff contends that the said policy was in force on October 31, and that the purported notice of cancellation by the company was ineffective and inoperative because it was not given to the McKeevers as provided in the policy and by law, in that the said notice was not mailed to the McKeevers at the address last shown on said policy.

### Was The Policy Cancelled?

Section 651 of the Insurance Code of the State of California, which was in existence at the time of the events involved in the present case, provides: "Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy shall be effective prior to the mailing or delivery to the named insured at the address

---

[5] At the trial the issue of bad faith was withdrawn from the jury by the trial court. The judge concluded that this issue was one of law for the decision of the court. Accordingly, the jury was instructed that if the notice of cancellation was not effective the jury should return a verdict for plaintiff for the sum of $17,428.79 (the amount of the judgment in the default proceedings against McKeever); but that if the said notice was effective then the verdict should be for defendant.

shown in the policy, of a written notice of the cancellation stating when, not less than ten (10) days after the date of such mailing or delivery, the date the cancellation shall become effective.'' The aforementioned clause contained in the company's policy of insurance and having to do with cancellation by the company is substantially in the language of section 651.[6] In construing language similar to the said clause in the instant policy of insurance, the Supreme Court, in *Jensen* v. *Traders & General Ins. Co.* (1959) 52 Cal.2d 786 [345 P.2d 1], held that such a cancellation clause permitted effective cancellation by mailing notice to an insured without regard to the receipt of such notice. *Jensen,* which was considering a factual situation occurring prior to the enactment of section 651, held that this method of cancellation was not contrary to the public policy of this state. Moreover, *Jensen* took cognizance of the enactment of section 651 in 1957, and declared that the methods therein provided for the cancelling of an insurance policy by '' 'mailing or delivery' '' were equally lawful means. (P. 797.)

Plaintiff does not dispute the company's unrestricted privilege of cancellation; nor does she question that effective cancellation can be achieved by mailing notice to an insured regardless of whether the notice is received by the policyholder. She complains, however, that the policy was not cancelled at the specified date of October 22 because the notice was not *properly* mailed, i.e., that it was mailed to the wrong address. The gist of plaintiff's argument is that there was only one policy issued in the instant case, that is, the policy originally issued on the 1949 Plymouth; and that this policy was subsequently transferred to the 1955 Plymouth. The thrust of plaintiff's argument is that the notice was required to be mailed to the address shown in this policy; that this address is 2187 Bonifacio Street; and that the notice was not mailed to this address but to 137 Pine Street. It is urged by plaintiff that defendant did not have the right to change the address without the authorization of the McKeevers. In essence, says plaintiff, the company, by changing the address, attempted to modify the insurance contract in a manner not countenanced by the rules applicable to contracts generally. It is accordingly asserted by plaintiff that the company seeks to accomplish modification of an important element of the

---

[6]The policy provides, moreover, that ''Policy terms which are in conflict with the statutes of the State wherein this policy is countersigned are hereby amended to conform to such statutes.''

268

contract by indirect information and by the use of forms not prepared by nor familiar to the insured, and without bringing to his attention in any fashion that a change, either of policy number or address, was in effect being requested of him.

We are satisfied, in view of section 651, that if there was a valid cancellation in the present case, such cancellation must necessarily be predicated upon the notice of cancellation which was mailed to the insured on October 10. This notice, stating that the cancellation was effective as of October 22, was a timely and a lawful means of cancellation under the rule in *Jensen* and pursuant to section 651, provided it was mailed to the proper address. The contention made by the company that the policy was cancelled on October 17 when, as testified by Mrs. Hopper, McKeever was shown a copy of the letter of cancellation which he read in her presence, was told that his policy had been cancelled, and was advised that he had better get other insurance, is not tenable. It is clear that these acts do not constitute a "mailing" of the notice. Nor do they come within the purview of the alternate method of cancellation, i.e., by "delivery" of the notice. In its philological definition the word "deliver" denotes the physical act of transferring possession and implies a change of possession; and while it is not restricted in its definition to manual tradition to the transferee, it includes any physical act by which the transferor effects a change of possession from himself to the transferee. (*Benson v. Superior Court*, 214 Cal.App.2d 551, 558 [29 Cal.Rptr. 760].) It is obvious that by her conduct Mrs. Hopper did not intend to part with the possession of her copy of the letter of cancellation because, after showing it to McKeever, she retained it as a part of the Graham Agency files. Assuming, *arguendo*, that a delivery did take place, it was, nevertheless, ineffective, because the said notice provided for a cancellation as of October 22, a date *less* than 10 days after October 17.

The crux of our inquiry, then, is whether cancellation was effected on October 22 by mailing a notice to the McKeevers "at the address shown in the policy...." Plaintiff contends that there was only one policy and that, while the McKeevers had in fact moved to 135 Pine Street, the company was obliged to send the notice of cancellation to the address given by them and which appeared on the policy issued for the 1949 Plymouth, i.e., 2187 Bonifacio Street. There is substantial evidence in the record, however, that two

separate policies were issued, one for the 1949 Plymouth and one for the 1955 Plymouth. This evidence not only finds support in the testimony of the witnesses, Graham and Barnes, but it finds sustenance in the documentary evidence. The record discloses that two separate instruments bearing different policy numbers and covering two different automobiles were issued, and that separate "X cards" were made for each.[7] It is also undisputed that a new application for insurance was prepared at the time the 1955 Plymouth was purchased. Furthermore, McKeever testified that he personally took the registration papers for this car to Graham's office and that he told Graham he had just purchased a new car and that he wanted a policy to cover it. Moreover, in the agreed statement of facts the parties to this appeal have stipulated that the policy on the 1949 Plymouth was "for a period of six months from date unless the policy were sooner cancelled or otherwise terminated or *transferred.*" (Italics added.) There is ample evidence in the record that the policy on the 1949 Plymouth was "transferred" to the 1955 Plymouth. Barnes testified that the word "'transferred'" as used by the company meant that the policyholder was continually insured by the company when he changed cars, but that there were two separate and distinct policies of insurance issued, and that the new policy supplanted the old one entirely and was an independent and separate contract. Furthermore, Graham testified that he mailed a policy covering the 1955 Plymouth to the McKeevers upon receiving it from the company. The testimony by the McKeevers that they did not remember whether they received such a policy merely creates a conflict in the evidence. There is substantial evidence, therefore, to support the inference that a separate and distinct policy was issued for the 1955 Plymouth involved in the accident which is the subject of this litigation. ▮ The inquiry, then, is directed to the address shown on *this* policy. Under the procedure followed by the company only one policy is issued and this to the insured. The company does not keep a copy of the policy, nor a duplicate thereof. Its only record is the "X card" which designates the policy number, policy period, name and address of the insured and the coverage as defined in the company's standard policy form. In the instant case the McKeevers did not produce the said policy, stating that they didn't re-

---

[7] A policy is defined by Ins. Code, § 380, as follows: "The written instrument, in which a contract of insurance is set forth, is the policy."

member whether they had received it, and that they were unable to find it for the purposes of the trial. The envelope part of said policy was particularly significant because it was the portion of the policy which contained the address of the insured. Plaintiff urges the inference that it bore the same address as the first policy, i.e., 2187 Bonifacio Street. There is ample evidence, however, to substantiate a conflicting inference, to wit, that the address on the policy covering the 1955 Plymouth was designated thereon as 137 Pine Street. This inference is substantiated by the company's "X card" for said policy. The "X card" bears the 137 Pine Street address. This information, according to testimony adduced at the trial, was stamped on both the policy envelope and the "X card" at the same time by a duplicating stamp machine. Not only is the evidence ample to support the inference that the policy covering the 1955 Plymouth showed the McKeevers' address as 137 Pine Street, but there is considerable evidence in the record from which the jury could infer that McKeever himself gave and supplied this address information to the company. We need only to reiterate the following evidence: the testimony of Mrs. Hopper that McKeever informed her he had just moved to 137 Pine Street, when he made the claim for the stolen hub caps; the address of 137 Pine Street on the receipt obtained by McKeever from the Premium Automobile Supply for said hub caps; the mailing of the check in payment of said claim to the McKeevers at 137 Pine Street; and the designation of 137 Pine Street as the address of the McKeevers on the application for insurance on the 1955 Plymouth. With respect to this last mentioned application it should be noted that both of the McKeevers testified that the registration papers which they had handed to Graham bore the 135 Pine Street address. The inference could properly be drawn that at that time the McKeevers intended that the Pine Street, rather than the Bonifacio Street address, appear on the new policy as they were actually residing on Pine Street. The said registration papers do not appear as an exhibit in the instant case.

■ Here, again, we have a conflict in the evidence as to whether the 135 Pine Street or the 137 Pine Street address was given in connection with the data supplied in the application. The resolution of this conflict was for the trier of fact.

■ It should be noted, moreover, that there is sufficient evidence in the record to indicate that McKeever was not certain of his correct address on Pine Street. Not only is there evi-

dence that he gave the 137 Pine Street address to the automobile supply company and to the Graham Agency, as mentioned above, but there is testimony by Mrs. Hopper that when McKeever came into the office to inquire relative to the unearned premium check which he had received he stated that he "thought" his address was 135 Pine Street.

We do not intend to intimate that an insurance company can take upon itself the prerogative of changing the insured's address on a policy without the express authorization or agreement on the part of the insured, merely because it receives information that the insured is residing at an address other than the address which appears on the policy. An insured may prefer to receive communications regarding his insurance at an address specified by him in preference to that of his residence. In the absence of any policy provisions requiring that such address be his residence address he should have that privilege. We are not concerned here, however, with the question of a modification of an existing insurance contract involving a change of address, but with an address which becomes a part of the insurance contract upon its issuance and execution as a result of information *given* to the insurance company in connection with the application for such insurance. There is sufficient evidence in the present case to substantiate the inference that the new policy covering the 1955 Plymouth contained the 137 Pine Street address when it was issued, as a result of information supplied by the McKeevers, and that this address was given by them as the address to be shown on said policy. ■ Moreover, there is sufficient evidence to establish that this policy was sent to the McKeevers and was received by them. The McKeevers did not deny receiving this policy. Their testimony is that they could not recall whether they received it. In any event, it is significant that the company was not notified after the issuance of said policy that it bore an incorrect address. Accordingly, the company had a right to rely on the information received by it as to the address of the McKeevers. ■ The determination whether the 137 Pine Street address was *given* to the company by the McKeevers as the address to be shown on the policy was a factual question for the jury. Indeed, the record in this case demonstrates, as we have pointed out above in several instances, that the vital issues presented were factual and therefore for the jury's determination. ■ We have no power to judge the effect or the value of the evidence, to weigh the evidence, to consider the

272

credibility of witnesses or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. (*Phillips* v. *Standard Acc. Ins. Co.*, 180 Cal.App.2d 474, 480 [4 Cal.Rptr. 277] ; *In re Gano*, 160 Cal.App.2d 700, 705 [325 P.2d 485].) ▮ We must accept as true all evidence tending to support the jury's verdict. ▮ In reviewing the evidence we are therefore limited to a determination as to whether there is substantial evidence, contradicted or uncontradicted, which will support the verdict without reweighing the evidence or questioning the credibility of witnesses. (*Thayer* v. *Pacific Elec. Ry. Co.*, 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56] ; *Estate of Teel*, 25 Cal.2d 520, 526-527 [154 P.2d 384] ; *Nordin* v. *Atchison, Topeka & S. F. Ry. Co.*, 202 Cal.App.2d 739, 741 [21 Cal.Rptr. 173] ; *Neyens* v. *Sellnow*, 202 Cal.App.2d 745, 748 [21 Cal.Rptr. 151].) ▮ In conformity with this duty, and in the light of the record, we conclude that the evidence in this case is sufficient to support a finding that the company complied with the method provided by the insurance policy and section 651 of the Insurance Code for the cancellation of such policy when it mailed the notice of cancellation on October 10. The evidence, therefore, is sufficient to sustain the verdict and judgment.

### Did the Trial Court Err in Refusing to Give a Requested Instruction?

▮ Plaintiff claims that it was prejudicial error for the trial court to refuse to give an instruction requested by her to the effect that when the company learned that the 137 Pine Street address in the notice of cancellation was incorrect prior to the date when the policy was to be cancelled, it had the duty to direct a notice of the cancellation to the address which had been previously given, i.e., 2187 Bonifacio Street.[8]

---

[8]The proposed instruction in its entirety reads as follows: "You are instructed that if you find that there is under the terms of the insurance policy and the exhibits and evidence you have heard, reasonably any doubt in the mind of a reasonable person that the insured may have been shown by the declarations in the policy to have had more than one address to which notice may have been sent, it will then be your duty to determine whether the defendant insurance company, upon learning that the first mailed notice did not reach the insured, before the date of cancellation, should have taken other reasonable steps to mail a notice similar to the first notice, to the other address of the insured or to the newly discovered correct address of the insured. You shall then determine under all the facts whether the defendant's insurance company did so reasonably act.

"If you find State Farm Insurance Company, defendant, did so reasonably act, then you will find that there was proper notice of cancellation under the policy, but if you find defendant State Farm Insurance Company did not so reasonably act, you will find that there was no

This instruction is predicated upon *Griffin* v. *General Acc. Fire & Life Assur. Co.,* 94 Ohio App. 403 [116 N.E. 2d 41], which plaintiff asserts is factually similar to the case at bench. In *Griffin,* the reviewing court held that the mailing of a notice which is not received by the insured is not sufficient to effect a cancellation even though the policy provided that it could be cancelled by mailing a notice of cancellation to the named insured at the address shown in the policy and that the mailing of the notice shall be sufficient proof of notice. The rationale of *Griffin* is that where the company is apprised that the insured has not received the notice by mail and has knowledge where delivery may be made, the notice by mail was ineffective in the absence of evidence that diligent efforts were made to find the insured and deliver such notice. A reading of the case discloses, moreover, that two addresses of the insured were shown in the policy, both of said addresses being placed therein by the insurer. In that case a notice had been mailed to the insured's residence address but no effort was made to serve him either by mail or by delivery at his business address, the other address shown on the policy. *Griffin* is not only factually different from the case at bench, but it expresses a rule contrary to that of *Jensen* and section 651 when it declares that receipt of the notice of cancellation is necessary to effectively cancel an insurance policy. ■ As we have pointed out above, the California law, as declared by section 651 and as interpreted by the *Jensen* case, both on the basis of said statute and the construction of standard cancellation clauses by courts throughout the United States, is that mailing of the notice is the determining factor in cancellation, not the receipt of the notice, i.e., a policy of insurance is cancelled at the specified date if notice is properly mailed regardless of whether the notice is ever received by the policyholder. ■ Plaintiff's proposed instruction, therefore, was contrary to California law and the trial court was justified in refusing to give it.

In view of the conclusions herein reached that there is sufficient evidence to support a finding that the policy covering the 1955 Plymouth was effectively cancelled on October 22, we need not discuss the issues of alleged bad faith in failing or refusing to settle or compromise plaintiff's claim arising out of the subject accident occuring on October 31;

effective notice of cancellation, and you will return a verdict for the plaintiff in the sum of $10,000.00.''

nor need we consider the question of the validity of the assignment to plaintiff of the rights of the McKeevers under said policy. These issues presuppose a policy in existence and in force on October 31.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.